**CDB SOFTWARE, INC., Appellant,**

v.

**Charles Lindsey KROLL, Appellee.**

**No. 01–97–01278–CV.**

Court of Appeals of Texas, Houston (1st Dist.).

Dec. 4, 1998.

Ramon G. Viada, Houston, for Appellee.

Panel consists of Justices MIRABAL, O'CONNOR, and NUCHIA.

## OPINION

O'CONNOR, Justice.

CDB Software, Inc., the plaintiff below, appeals a jury verdict in favor of Charles Kroll, the defendant below. Kroll appeals the jury's nominal award of damages. We modify the judgment below and, as modified, affirm.

### Factual Background and Procedural History

CDB, founded by Richard Barry in 1985, is a small Houston company that develops and licenses software products for mainframe computer systems. Before 1990, Barry owned 60 percent of CDB's stock and Jeanne Eaton owned 40 percent.

In 1988, Barry hired Kroll. In October 1989, CDB began negotiations with Candle Corporation for CDB to convey ownership of an undivided interest in CDB's computer software products to Candle. Under the deal, Candle would pay CDB a 15 percent royalty on fees Candle received from licensing the products over a ten-year period.

In November 1989, Barry resigned as CDB's president and director, but he continued to be majority shareholder and to earn income indirectly from CDB through an outside consulting firm called jtrak services, inc.[1] Barry's departure left Kroll as CDB's sole director, president, chief executive officer, and chief financial officer; however, Kroll was not a shareholder. In February 1990, CDB's shareholders (Barry and Eaton) appointed Fred Earhart, another CDB employee, to CDB's board of directors.

In 1990, Kroll decided he wanted to renegotiate his compensation package. In February 1990, Kroll sent a letter to Ear-

William Karl Kroger, Houston, for Appellant.

---

1. The record indicates the company's name is spelled entirely in lower case.

hart proposing that CDB and Kroll enter into a new employment contract and compensation arrangement. Kroll asked Earhart to work with CDB's outside counsel, Gene Rooke, to create a compensation package for Kroll. Rooke drafted three documents: (1) the "Employment Agreement," which provided a yearly salary of $150,000 for two years; (2) the "Additional Compensation Agreement," which gave Kroll a share in CDB's revenues; and (3) the "Deferred Compensation Agreement," which required CDB to deposit $150,000 into a trust account, with additional $50,000 deposits on December 31st of 1990 and 1991 (collectively, the compensation agreements). The compensation agreements required CDB to pay Kroll these amounts even upon Kroll's death, disability, or termination. On March 20, 1990, after discussing the compensation agreements with Barry, Kroll and Earhart signed the agreements.

Although Kroll, as CDB's president, had the authority to pay himself according to the terms of the compensation agreements, from 1990 until 1994, he did not.

By the summer of 1990, Barry owned 100 percent of CDB's stock. In March 1994, Barry fired Kroll. In April 1994, Kroll sent a letter to Barry demanding payment under the compensation agreements. Barry refused. In May 1994, Kroll notified CDB of its breach of the compensation agreements and demanded that the parties submit the dispute to arbitration. Instead, CDB filed a declaratory judgment action, asking the court to determine that the compensation agreements were invalid and unenforceable. Kroll filed a plea in abatement, answer, and counterclaim seeking damages under the compensation agreements.

The case was tried to a jury in April 1997 and the jury found as follows:

1. Earhart and Kroll did not agree that submitting the agreements to the shareholders before April 15, 1990 was required before the compensation agreements became effective.

2. CDB's failure to comply with the compensation agreements was not excused by Kroll's waiver, fraud, or Kroll's failure to comply with a material obligation of the compensation agreements.

3. Kroll did not breach his fiduciary duty to CDB in connection with the compensation agreements.

4. CDB's shareholders did not ratify the compensation agreements.

The jury awarded Kroll $516,000 for breach of the Employment Agreement, $876,613 for breach of the Additional Compensation Agreement, and $1.00 for breach of the Deferred Compensation Agreement.

Kroll filed a motion to disregard the jury's nominal award for breach of the Deferred Compensation Agreement, which motion the trial court denied. The trial court also reduced the jury award for breach of the Employment Agreement from $516,000 to $300,000 and offset Kroll's total award by the stipulated amount that CDB paid Kroll while the compensation agreements were in effect. The total of Kroll's award amounted to $539,271, plus interest, and $200,000 in attorney's fees.

On appeal, CDB raises nine issues: (1) the evidence is legally and factually sufficient to support the jury's findings; (2) the trial court erred in overruling CDB's motion for directed verdict and refusing to submit CDB's proposed issues on equitable estoppel, novation, accord and satisfaction, laches, and mitigation of damages; (3) limitations barred Kroll's claim for damages; and (4) the trial court erred in refusing to suggest a remittitur of $222,777 under the Additional Compensation Agreement. Kroll brings one cross-issue, which challenges the jury's award of $1.00 for damages under the Deferred Compensation Agreement.

## A. Limitations

In issue eight, CDB asserts the trial court erred in overruling its motion for

judgment notwithstanding the verdict (JNOV) on the ground that part of the damages awarded to Kroll was barred by the statute of limitations.

### 1. Standard of review

■ A JNOV is proper when a directed verdict would have been proper. Tex.R. Civ. P. 301; *Fort Bend County Drainage Dist. v. Sbrusch*, 818 S.W.2d 392, 394 (Tex.1991). A motion for JNOV should be granted when (1) the evidence is conclusive, and one party is entitled to recover as a matter of law, or (2) a legal principle precludes recovery. *Mancorp, Inc. v. Culpepper*, 802 S.W.2d 226, 227 (Tex.1990); *John Masek Corp. v. Davis*, 848 S.W.2d 170, 173 (Tex.App.—Houston [1st Dist.] 1992, writ denied). We review the denial of CDB's motion under the legal sufficiency standard. *See Brown v. Bank of Galveston*, 963 S.W.2d 511, 513 (Tex. 1998) (JNOV).

### 2. Limitations

■ CDB filed its petition seeking a declaratory judgment and attorney's fees on June 15, 1994. Kroll filed his counterclaim for breach of the compensation agreements on September 9, 1994. CDB asserts that the four-year statute of limitations bars recovery of any payments due under the compensation agreements that accrued before September 9, 1990. *See* Tex. Civ. Prac. & Rem.Code § 16.004(a)(3) (1986). Kroll asserts that Civil Practice & Remedies Code section 16.069 precludes CDB's limitations defense. That section reads as follows:

> If a counterclaim or cross claim arises out of the same transaction or occurrence that is the basis of an action, a party to the action may file the counterclaim or cross claim even though as a separate action it would be barred by limitation on the date the party's answer is required.

Tex. Civ. Prac. & Rem.Code § 16.069(a) (1997).

CDB asserts Kroll's counterclaim is not among those contemplated by section 16.069 for a number of reasons: (1) CDB sought only a declaration that the compensation agreements were invalid, not monetary damages; (2) Kroll's counterclaim was not in opposition to a monetary demand; and (3) CDB was the nominal plaintiff merely because it filed its action first. CDB concludes that Kroll's breach of contract claim was not a true counterclaim. CDB relies on *McBryde v. Curry*, 914 S.W.2d 616 (Tex.App.—Texarkana 1995, writ denied) for this assertion.

In *McBryde*, Curry lent McBryde money under a demand note signed on May 15, 1986. McBryde named Curry as a beneficiary of his life insurance policy to the extent of his debt to Curry. McBryde died in May 1994, and Curry presented a claim for $200,000 as a creditor of McBryde based on the demand note. Because the other beneficiaries of the insurance policy disputed the claim, the insurance company filed suit and deposited the $200,000 into the registry of the court. Curry was granted summary judgment on her claim. The beneficiaries appealed, asserting Curry's claim was barred by the four-year statute of limitations. Curry asserted that her counterclaim was timely under section 16.069. The beneficiaries responded that Curry's claim was not a true counterclaim within the scope of section 16.069(a). The Texarkana court held Curry's claim was not within the scope of section 16.069 because Curry was only a nominal defendant (no other party sought relief against her) and her claim was not in opposition to a money demand by the plaintiff (the insurance company was not demanding any relief). *Id.* at 620.

Here, CDB's petition sought relief in the form of a declaratory action seeking a determination that the compensation agreements were unenforceable and attorney's fees. Kroll's counterclaim sought a determination that CDB had breached the agreements. *See Latham v. Allison*, 560 S.W.2d 481, 485 (Tex.Civ.App.—Fort

Worth 1977, writ ref'd n.r.e.) (defining counterclaim as "a claim, which, if established will defeat or in some way qualify a judgment to which the plaintiff is otherwise entitled. It embraces both setoff and recoupment, and also comprehends reconvention as well as all adversary actions by the defendant in a case."); *see also* **Black's Law Dictionary** 315 (5th ed.1979) (defining counterclaim as a "claim presented by a defendant in opposition to or deduction from the plaintiff's claim").[2] Accordingly, the trial court did not err in overruling CDB's motion for JNOV. *See generally Hobbs Trailers v. J.T. Arnett Grain Co., Inc.,* 560 S.W.2d 85, 88 (Tex. 1977) (holding that if appellee's breach of contract action had been asserted in a counterclaim or crossclaim, article 5539c, the predecessor to section 16.069, would have applied); *Barraza v. Koliba,* 933 S.W.2d 164, 167–68 (Tex.App.—San Antonio 1996, writ denied) (plaintiffs filed declaratory action and asked for attorney's fees; holding: defendant's DTPA counterclaim timely under section 16.069); *ECC Parkway Joint Venture v. Baldwin,* 765 S.W.2d 504, 513–14 (Tex.App.—Dallas 1989, writ denied) (Duvall–Giles asserted that section 16.069 did not apply because its claim against ECC was not for affirmative relief but only for attorney's fees that were contingent on outcome of Baldwin's claim against ECC; holding: claim for attorney's fees is a claim for affirmative relief, and, therefore, ECC's counterclaim against Duvall–Giles not barred by limitations).

We overrule CDB's eighth issue.

## B. Kroll's Cross–Issue

Kroll asserts the trial court erred in refusing to disregard the jury's award of $1.00 for damages under the Deferred Compensation Agreement because his damages were $250,000 as a matter of law.

## 1. Standard of review

■ Because Kroll had the burden of proof on this issue, we treat his cross-issue as asserting that the evidence conclusively establishes his damages under the Deferred Compensation Agreement at $250,-000. We first examine the record for evidence that supports the finding and ignore all evidence to the contrary. *Sterner v. Marathon Oil Co.,* 767 S.W.2d 686, 690 (Tex.1989); *Pizzitola v. Galveston County Cent. Appraisal Dist.,* 808 S.W.2d 244, 246–47 (Tex.App.—Houston [1st Dist.] 1991, no writ). If there is no evidence that supports the finding, only then do we look to see if the contrary proposition was established as a matter of law. *Sterner,* 767 S.W.2d at 690; *Pizzitola,* 808 S.W.2d at 247. If there is any evidence of probative force to support the finding, the point must be overruled and the finding upheld. *Sherman v. First Nat'l Bank,* 760 S.W.2d 240, 242 (Tex.1988); *Neese v. Dietz,* 845 S.W.2d 311, 312 (Tex.App.—Houston [1st Dist.] 1992, writ denied).

## 2. Sufficiency of the evidence

■ The Deferred Compensation Agreement provides as follows: "In the event [Kroll] is terminated for reason other than cause, [Kroll] shall be immediately vested in the Key Employee Trust and entitled to receive all of the assets therein and which thereafter accrue to such accounts." When Kroll was terminated, the trust account contained no assets. Kroll admitted he was responsible for setting up the trust account, he did not set up the account, and he deferred setting up the account on his own and "it [was his] own personal loss for having done it." CDB contends this evidence is legally sufficient to support the jury's finding that $1.00 fairly and reasonably compensated Kroll for his damages resulting from breach of

2. **Black's** also defines "recoupment" as implying "that plaintiff has cause of action, but asserts that defendant has counter cause of action growing out of breach of some other

part of same contract on which plaintiff's action is founded, or for some cause connected with contract." *Id.* at 1146.

the Deferred Compensation Agreement. We disagree.

Kroll's admission that he was responsible for setting up the trust account, but did not, and that it was his own personal loss for not having done so, does not negate the jury's finding that Kroll did not waive his rights under the Deferred Compensation Agreement. The fact that the trust account did not contain any assets when Kroll was terminated does not negate his entitlement to any assets that would accrue to the account.

█ A nonbreaching party is generally entitled to all its actual damages necessary to put it in the same economic position in which it would have been had the contract not been breached. *General Elec. Supply Co. v. Gulf Electroquip, Inc.,* 857 S.W.2d 591, 599 (Tex.App.—Houston [1st Dist.] 1993, writ denied). Because the jury found that CDB's performance under the compensation agreements was not excused by Kroll's waiver or Kroll's failure to comply with a material obligation, Kroll was entitled to receive, as damages, the amount he would have received if the Deferred Compensation Agreement had not been breached.

The "Deferred Compensation Agreement" required CDB to deposit a total of $250,000 into a trust account. The trial court erred in not disregarding the jury's award of $1.00 for damages under the Deferred Compensation Agreement because Kroll's damages under that agreement were $250,000 as a matter of law.

We sustain Kroll's cross-issue.

### C. CDB's Conditional Cross–Issue

CDB asserts that, if this Court sustains Kroll's cross-issue, Kroll's recovery of $150,000 of the $250,000 under the Deferred Compensation Agreement is barred by the statute of limitations. For the same reason we overruled CDB's eighth issue, we also overrule CDB's conditional cross-issue.

### D. Waiver

In issue one, CDB asserts the evidence was legally and factually insufficient to support the jury's finding that CDB's breach of the compensation agreements was not excused by Kroll's waiver.

### 1. Standard of review

At trial, the burden was on CDB to prove waiver. *El Paso Natural Gas Co. v. American Petrofina Co.,* 733 S.W.2d 541, 553 (Tex.App.—Houston [1st Dist.] 1986, writ ref'd n.r.e.). Because CDB attacks the legal sufficiency of an adverse finding on an issue on which it had the burden of proof, we first examine the record for evidence that supports the finding and ignore all evidence to the contrary. *Sterner,* 767 S.W.2d at 690; *Pizzitola,* 808 S.W.2d at 246–47. If no evidence supports the findings, only then do we look to see if the contrary proposition was established as a matter of law. *Sterner,* 767 S.W.2d at 690; *Pizzitola,* 808 S.W.2d at 247. If there is any evidence of probative force to support the finding, the point must be overruled and the finding upheld. *Sherman,* 760 S.W.2d at 242; *Neese,* 845 S.W.2d at 312.

█ In reviewing a factual sufficiency point, we consider and weigh all of the evidence and set aside the verdict only if the evidence is so weak or the finding so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986); *Pizzitola,* 808 S.W.2d at 247.

█ Waiver is the intentional relinquishment of a known right by actual renunciation or by intentional conduct inconsistent with claiming the known right. *Tenneco, Inc. v. Enterprise Prod. Co.,* 925 S.W.2d 640, 643 (Tex.1996). CDB does not assert that Kroll expressly waived his rights under the compensation agreements. Instead, CDB contends that Kroll's silence over a period of four years constituted waiver. A party's silence or inaction over a period of time long enough

to show an intention to yield the known right is enough to show waiver. *Id.*

### 2. Legal sufficiency of the evidence

██ We first examine the evidence under the legal sufficiency challenge. Kroll testified he deferred paying himself under the terms of the compensation agreements and he did not have CDB fund the trust account because he felt CDB needed to keep its limited cash reserves available to cover CDB's growing indebtedness to Candle and its loss of revenues.[3] Kroll said that, until the day he was fired, he did his best to· ensure that CDB was successful and part of that effort included deferring his compensation.

Kroll stated that shortly before the deal with Candle became final, Mike Rutledge, a lawyer representing CDB, jtrak, and Barry, told Kroll that Candle wanted Kroll to waive his compensation agreements. Kroll said that Rutledge, Barry, and he discussed Candle's proposal, but rejected the idea.

On July 3, 1990, the deal with Candle became final. The parties to the software purchase agreement were Candle and the so-called "Barry Group," which consisted of CDB, jtrak, and Barry individually. The purchase agreement contained several references to the compensation agreements:

1. A disclosure statement and a list of material obligations not incurred in the ordinary course of business both referred to "Obligations under CDB employment contracts with [Kroll and two other employees], dated March 20, 1990...."
2. The disclosure statement referenced the commissions to be paid to Kroll: "In addition, Mr. Kroll and CDB entered into an employment contract

dated March 20, 1990. The employment contract, which is ˙ attached hereto, provides that Mr. Kroll shall ,receive a commission, the rates ,of which will vary depending on the level and the nature of CDB's revenues."

3. The purchase agreement stated that "The execution, delivery and performance of this Agreement and all other agreements of the Barry Group referenced by this Agreement have been duly authorized by all necessary corporate and other action...."

The deposition testimony of Bill Wood, the Candle employee chiefly responsible for negotiating the deal with CDB, was read to the jury. He testified that Barry and CDB represented and warranted that the compensation agreements were valid and binding on CDB. Wood stated that the representations in the purchase agreement by CDB that Kroll's compensation agreements were valid and binding on CDB was an important representation. Wood explained that Kroll "was deferring compensation and we [Candle] needed to understand that we were assuming no responsibility for—for paying deferred compensation fundamentally." When asked if the representation underscored CDB's responsibility to pay the ,deferred compensation, Wood answered, "That's correct." Wood stated that Candle was never told that Kroll's agreements were not valid and binding. Wood also testified that sometime between 1989 and 1992, Kroll told him he was deferring some of his compensation because of CDB's financial condition.

This evidence is legally sufficient to support the jury's finding that CDB's perfor-

**3.** When Barry hired Kroll in 1988, a lawsuit was pending in which Eaton had sued CDB and Barry personally. On May 8, 1990, CDB redeemed Eaton's shares and settled the lawsuit for $2 million. Candle financed the settlement by loaning CDB $2 million, payable in five-year installments, with a balloon payment due in May 1995. Candle also made additional funds available to CDB for its operating expenses. After the deal with Candle closed, CDB saw its revenues decrease, making it all the more dependant on Candle.

mance under the compensation agreements was not excused by Kroll's waiver.

### 3. Factual sufficiency of the evidence

We next consider the factual sufficiency challenge and review all the evidence stated above as well any contrary evidence.

The evidence contrary to the jury's finding included the following. Kroll did not pay himself in accordance with the terms of the compensation agreements, disclose he was deferring his compensation, or establish the trust fund. Barry testified that he did not see the compensation agreements until after Kroll was fired. Wood said he did not recall Candle's asking Kroll to waive the compensation agreements, and Barry said there was never a meeting to discuss Candle's request that Kroll waive the compensation agreements.

The jury's finding is not so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. The evidence is factually sufficient to support the jury's finding that CDB's performance under the compensation agreements was not excused by Kroll's waiver.

We overrule CDB's first issue.

### E. Validity of Compensation Agreements

In issue two, CDB asserts the trial court erred in denying its motions for directed verdict and for JNOV because the compensation agreements were not valid corporate acts. CDB contends the compensation agreements were not valid corporate acts because they were not ratified by a majority of the directors.

### 1. Standard of review

■ A directed verdict is proper when (1) a defect in the opponent's pleadings makes them insufficient to support a judgment, (2) the evidence conclusively proves a fact that establishes a party's right to judgment as a matter of law, or (3) the evidence is legally insufficient to raise an issue of fact. *Metzger v. Sebek*, 892 S.W.2d 20, 40 (Tex.App.—Houston [1st Dist.] 1994, writ denied). We apply the same standard of review for a JNOV as that under section A.1., above.

We review the denial of CDB's motions under the legal sufficiency standard. *See Cliffs Drilling Co. v. Burrows*, 930 S.W.2d 709, 712 (Tex.App.—Houston [1st Dist.] 1996, no writ) (directed verdict); *see also Brown*, 963 S.W.2d at 513 (JNOV).

### 2. Sufficiency of the evidence

CDB asserts that a majority of the directors were required to approve the compensation agreements, CDB had only two directors (Kroll and Earhart), and Earhart signed the compensation agreements as a director, but Kroll signed in his individual capacity only. Therefore, CDB argues, a majority of CDB directors did not approve the compensation agreements because only one director (Earhart) signed the agreements.

■ The directors are the managers of a Texas corporation. Tex. Bus. Corp. Act art. 2.31 (1997); *American Bank & Trust Co. v. Freeman*, 560 S.W.2d 444, 446 (Tex.Civ.App.—Beaumont 1977, writ ref'd n.r.e.). A formal vote is not required to validate acts done at a directors' meeting unless a formal vote is required by statute, charter, or bylaw. 2 Fletcher, Cyclopedia of Corporations § 418 (Perm. Ed.1990). A written contract may be executed without a formal vote if all the directors are present and assent and no formal vote is otherwise required. *Id.* The ratification or adoption of a contract by a corporation through its board of directors may be implied. *Id.*

The Business Corporation Act does not expressly require a formal vote by the directors before an action of the directors is valid: "*The act* of the majority of the directors present at a meeting at which a quorum is present shall be *the act* of the board of directors, unless the act of a greater number is required by law or the articles of incorporation or the bylaws." Tex. Bus. Corp. Act art. 2.35 (1998) (emphasis added). CDB does not assert that its charter or bylaws required a formal

vote before the compensation agreements could become effective.

 The approval of the compensation agreements by CDB's board of directors may be inferred from the following acts taken by CDB's board: before Earhart and Kroll signed the compensation agreements, they discussed the agreements and held a directors' meeting to approve the agreements, subject to shareholder ratification; at the directors' meeting, Earhart voted to approve the compensation agreements and Kroll abstained from voting; and, after the directors' meeting, Earhart signed the agreements as a CDB director and Kroll signed in his individual capacity. The trial court did not err in overruling CDB's motions for directed verdict and for JNOV.

We overrule CDB's second issue.

The discussion of the remaining points of error does not meet the criteria for publication, Tex.R.App. P. 47.4, and is, thus, ordered not published.

We modify the judgment below to award Kroll $250,000 under the Deferred Compensation Agreement and, as modified, we affirm the trial court's judgment.